UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Landon White
      Plaintiff,

CASE NO.: GLR 25-CV-1805

-Vs-

LYDIA LAWLESS, individually and in her official capacity as Bar Counsel for the Attorney Grievance Commission of Maryland;
JOHN/JANE DOES 1–10, in their official and/or individual capacities as agents of the Maryland Attorney Grievance Commission;
ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,
DEFENDANTS.

_____/

PLAINTIFF'S FIRST ~~AMENDED~~ (in v) COMPLAINT WITH **JURY DEMAND**

## INTRODUCTION

USDC- BALTIMORE
'25 JUN 6 PM 4:08

The Maryland Attorney Grievance Commission ("AGC") states that it is dedicated to protecting the public and maintaining the legacy of the legal profession. The Maryland Attorneys' Rules of Professional Conduct ("MPC") are the rules designed to ensure this protection. Every attorney, including Bar Counsel, is bound to follow those rules. Under the MPC, even if no one is harmed, when a rule is broken the referee must call the foul.[1] But what happens when the star player, in this case Bar Counsel, knows the rules will not apply to them?

Between 2011 and 2022, Maryland's disciplinary referee, the AGC, swallowed its whistle and failed to monitor lead Bar Counsel and staff. During this period, Defendant Lydia Lawless employed tactics of arbitrary prosecution, disproportionately targeted high-profile Black attorneys, conducted overt investigations, and granted friendly favors, all while building an inflated record of disciplinary actions. Following Defendant Lawless's departure, sanctions

---

[1] See *Attorney Grievance Comm'n v. Singh*, 464 Md. 645, 654 (2019) ("In the attorney grievance context, even when no harm results, 'a foul is a foul.'").



Rcv'd by: _____

sharply declined. While this overall increase in prior sanctions might superficially suggest greater scrutiny, the disproportionate concentration of docketed cases in Baltimore City and Prince George's County—jurisdictions with large African American attorney populations raises serious concerns of selective enforcement.

Notably, nine black attorneys from Maryland's first community legal incubator space were targeted during this period, while similarly situated white attorneys in other counties were not subjected to comparable investigations or discipline. These practices have tarnished the legacy of Maryland's legal profession.

This is a civil rights action under 42 U.S.C. § 1983 and the Maryland Declaration of Rights, challenging ongoing racial discrimination, retaliation, and selective enforcement of attorney disciplinary rules by agents of the AGC, particularly former Bar Counsel Lydia Lawless. Plaintiff, an African American attorney, alleges that Defendant Lawless and others subjected him and at least nine other Black attorneys to harsher investigative and disciplinary tactics based on race, in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the First Amendment's protections for free speech and advocacy, and Articles 24 and 46 of the Maryland Declaration of Rights.

**PERSONAL NARRATIVE OF PLAINTIFF'S RETALIATION AND TARGETING**

For Plaintiff, the AGC's selective enforcement practices were no abstract concern — they became deeply personal. Plaintiff, an accomplished attorney who served as trial counsel in the landmark *Korryn Gaines* verdict and represented clients such as Dagoberto Velez in complex commercial matters in the New York Commercial Division (*Velez v. Mitchell, et al.*, Index No. 654372/2020), had built a career advocating for justice and equity on behalf of underserved

communities. After lawfully representing a Black attorney in proceedings that challenged Defendant Lawless's conduct and exposed discriminatory patterns within the AGC, Plaintiff was targeted for investigation and ultimately sanctioned.

In a sharp departure from the AGC's stated principles of neutrality and fairness, Plaintiff's protected advocacy triggered a retaliatory campaign—driven not by the merits of his conduct, but by an effort to silence criticism and reinforce a culture of selective enforcement. The removal and discrediting of an attorney with demonstrated success in civil rights litigation and complex commercial practice not only damaged Plaintiff's professional standing, but deprived the community of a critical advocate for justice. In short, when Plaintiff sought to call out the referee for swallowing the whistle, the referee instead turned the whistle on him.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 for claims arising under federal law.

2.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as all events giving rise to this action occurred in Maryland.

## PARTIES

3.  **Plaintiff**, Landon White, is an African American and was at all times relevant to this matter an Attorney residing in Baltimore, Maryland.

4.  **Defendant Lydia Lawless** was, at all relevant times, a staff attorney for the Attorney Grievance Commission. She is sued in her individual and official capacities.

5. **Attorney Grievance Commission of Maryland** is an agency of the Maryland Judiciary that oversees attorney discipline.

6. **John/Jane Does 1–10** are unknown state actors or employees of the Commission who conspired or aided in the discriminatory actions.

   All individual Defendants are sued in both their individual and official capacities.

---

## FACTUAL ALLEGATIONS

### A. Background

7. Defendant Lydia Lawless was a 2007 law school graduate from American University, where she served as a staff editor for a secondary journal.

   Defendant Lawless joined the Maryland Grievance Commission as a staff attorney for Bar Counsel in 2011.

   Prior to working at the Commission, Defendant Lawless worked at her family's boutique tax and estate law firm, Vespar and Lawless, located in Montgomery County, Maryland.

8. While working at the AGC, Defendant Lawless was a staff attorney while Attorney Edward Smith represented many attorneys facing investigations and disciplinary hearings against Bar Counsel.

   Edward Smith, the former head of Baltimore City's attorney disciplinary commission, mentored over 50 attorneys in an incubator space he owned and operated.

   Mr. Smith provided free office space and mentorship to young lawyers for at least the first six months. His guidance helped many of these young attorneys achieve groundbreaking verdicts and recognition within the profession.

   The incubator space also housed many legendary Maryland Black lawyers, including the

late Congressman Elijah Cummings, Judge Lewynn Garett, Judge Quincy Coleman, and former Delegate Curt Anderson.

9. Mr. Smith served as wise counsel not only to the legal community but also to his former law partner, Democratic Congressman Elijah Cummings, and former Republican Governor Bob Ehrlich, both of whom valued his advocacy for prisoner rehabilitation. Mr. Smith practiced law for 40 years until Defendant Lawless was assigned his case as senior counsel for the Maryland Attorney Grievance Commission.

10. **B. Systemic Discrimination Against Black Attorneys**

11. The AGC granted Defendant Lawless unchecked power, allowing her to bypass systems, conduct improper investigations, impose arbitrary punishments, and shield her actions behind the confidentiality provisions of the MPC. Not only did the AGC fail to supervise Defendant Lawless's tactics, but they nominated her for national awards and promoted her to lead Bar Counsel following Mr. Smith's disbarment in 2016.

12. At just 36 years old, Defendant Lawless became the most powerful lawyer in the state when appointed lead Bar Counsel for the Attorney Grievance Commission in 2017. During her tenure as senior attorney and lead Bar Counsel (2016–2022), annual attorney sanctions exceeded the prior ten-year average. The FY2017 AGC report recorded 93 sanctioned attorneys, well above the ten-year average of approximately 65. Following Defendant Lawless's resignation, the FY2023 report showed only six disbarments, compared to the prior ten-year average of 25.

13. Between 2016 and 2022, at least nine African American attorneys sharing office space at the Saint Paul Street Incubator in Baltimore City were disproportionately investigated or sanctioned (ES, LW, EW, RJ, DA, AB, GJ, RN, and SM).

    During this period, Baltimore City and Prince George's County—both majority-Black jurisdictions—consistently ranked among the top five for docketed grievances.

    For example, in FY2021, Baltimore City had 48 docketed cases, compared to Howard County's 12, despite Howard County having a smaller population and attorney count.

14. The AGC practiced selectively treating suspensions exceeding 30 days as de facto disbarments for men of color—creating a discriminatory effect in reinstatement proceedings.

    (See Petition for Reinstatement of Raj Sanjeet Singh; see also Petition for Reinstatement of Roland Patterson.)

15. The AGC further engaged in initiating pretextual forensic audits of Black attorneys' IOLTA, escrow, and business accounts, leveraging criminal client complainants to circumvent standard audit protocols—leading to a disproportionate number of such audits targeting Black attorneys.

16. Additionally, the AGC unjustifiably minimized and discredited fees earned by Black attorneys—asserting such fees were unearned even when favorable outcomes had been achieved—while applying no comparable scrutiny to similarly situated white attorneys.

17. The AGC routinely elevated the testimony and credibility of convicted murderers and rapists above that of Black attorneys—conduct that was disproportionately applied in cases involving Black attorneys versus white attorneys.

18. The AGC engaged in abusive and bad-faith litigation practices, including issuing

   voluminous and unreasonable requests for admission designed to harass Black attorneys.

   (See "It's a Trap! The Ethical Dark Side of Requests for Admission," Saint Mary's Law

   Journal on Legal Malpractice and Ethics, Vol. 8, No. 1.)

   Over 300 admissions and 1,000 pages of documents were admitted in Plaintiff's

   disciplinary hearing. Plaintiff was not granted an extension beyond 30 days to review the

   documents, despite their volume, though an earlier motion to extend had been granted

   when the documents were first received.

   At the time of responding to these admissions, Plaintiff was preparing for an attempted

   murder trial, which resulted in a mistrial after a juror reported bullying by other jurors.

19. The AGC engaged in a pattern of retaliatory conduct targeting Black attorneys who

   zealously advocate for clients against Bar Counsel—routinely docketing complaints and

   employing overtly punitive investigative tactics to impose harsh sanctions, thereby

   chilling advocacy and disproportionately burdening Black attorneys. (See ES, WB, LW.)

20. On June 2, 2019, during a deposition conducted in the presence of AGC staff attorney

   Jennifer Thompson, Plaintiff himself testified under oath regarding the chilling effect of

   the AGC's practices on Black attorneys. When asked whether he had an attorney mentor,

   Plaintiff responded: "I don't want to get all emotional, but the folks that I do speak with,

   they're all worried about the bar themselves... there have been so many Black attorneys

   disbarred." (Deposition Transcript, June 2, 2019, p. 39.) This statement placed AGC staff,

   including Defendant Thompson, on clear notice of the racially disparate impact of the

   AGC's disciplinary practices and the fear it engendered within the Black legal

community. Despite this knowledge, Defendants continued to target and retaliate against Plaintiff in furtherance of their discriminatory and retaliatory scheme.

21. Plaintiff's own experience illustrates how this **pattern of retaliation operates in practice.**

22. Plaintiff observed and possesses firsthand knowledge of racially discriminatory investigative practices by the AGC during his representation of Attorney Edward Smith. Defendant Lawless, acting under color of state law, exhibited overt racial animus, maintained an unjustifiably adversarial posture toward Plaintiff's Black client, and employed litigation tactics not used against similarly situated white attorneys. This conduct reflected a broader pattern of racially disparate enforcement within the AGC.

23. On April 12, 2017, during a de bene esse deposition conducted at a correctional facility in connection with the disciplinary proceedings against Attorney Edward Smith, Plaintiff experienced a direct and personal act of intimidation by Defendant Lawless. While the deposition was off the record during a recess for Plaintiff to prepare for cross-examination of the Complainant, Defendant Lawless—then serving as a senior attorney at the AGC—explicitly threatened Plaintiff with professional repercussions if Plaintiff pursued a particular line of questioning with the witness. Plaintiff immediately objected to this conduct, informing both then-AGC staff attorney Lawson and Defendant Thompson that such intimidation was unacceptable and that the process was becoming, in Plaintiff's words, 'borderline racist.' Upon returning to the record, Plaintiff proceeded with the planned cross-examination of the Complainant despite Defendant Lawless's threats. This incident reflects the retaliatory and racially motivated tactics that Defendants

employed against Plaintiff from an early stage and further evidences Defendants' intent

to chill protected advocacy and silence opposition to discriminatory practices within the

AGC

24. Plaintiff's observation of Defendant Lawless's conduct in the Smith matter was not an

isolated incident but part of a systemic pattern of discriminatory enforcement against

Black attorneys.

25. After representing a Black attorney in opposition to Defendant Lawless in a disciplinary

matter, Plaintiff became the subject of a retaliatory investigation and was ultimately

sanctioned—demonstrating the AGC's misuse of disciplinary authority to chill protected

advocacy.

26. This experience is not unique; other Black attorneys and those advocating for Black

clients have similarly faced retaliatory investigations and disproportionate sanctions,

including ES, WB, LW, MM, and KR.

27. Defendant Lawless's default justification when questioned about conflicts of interest is

that AGC investigations are private.

28. Following Defendant Lawless's resignation, FY2023 saw only six disbarments and 17

suspensions—significantly lower than the prior ten-year averages of 25 and 23,

respectively.

In FY2023, the Office of Bar Counsel opened 1,696 files, an increase from 1,589 and

1,433 in FY2022 and FY2021. (See AGC Annual Reports.)

In 2021, 48.2% of docketed cases, and in 2022, 37.2% of docketed cases, originated

from Baltimore City, Baltimore County, and Prince George's County—jurisdictions with

large Black attorney populations.

In 2022, approximately 4.3% of Maryland lawyers were Black. (See American Bar Association, Profile of the Legal Profession (2022).)

29. Plaintiff, as a Black solo practitioner, faced more invasive standards than similarly situated white attorneys, including excessive demands for escrow records, irrelevant client files, and micromanagement of his practice.

30. After voicing concerns about racial bias during the Edward Smith investigation and his own disciplinary proceedings, Plaintiff experienced escalating retaliation.

31. Plaintiff was induced to enter a so-called Diversion Program, which Defendants structured to ensure failure and create a de facto path to disbarment rather than rehabilitation.

   **Similarly situated attorneys participating in the Diversion Program, whose monitors were white attorneys, were not removed from the program.**

32. As a condition of the Program, Defendant Lawless prohibited Plaintiff from practicing post-conviction law—a field in which Plaintiff had achieved a success rate more than double the statewide average.[2] No similarly situated white attorney with such demonstrated success would be barred from that area of practice.

33. Defendant Lawless's actions forced Plaintiff to notify his post-conviction clients of his withdrawal, resulting in two new grievances against him.

34. Defendant Lawless further imposed a condition requiring Plaintiff to attend a financial accounting course taught by an AGC staff investigator, yet deliberately obstructed Plaintiff's ability to enroll—creating an impossible compliance trap.

---

[2] See Maryland Office of the Public Defender, "Written Testimony on HB131: Postconviction Review — Motion for Reduction of Sentence," February 2021, at p. 2 ("statewide success rate on post-conviction petitions was approximately 8%, consistent with national averages").

35. In connection with the required financial accounting course, even Charles Miller—the Attorney Grievance Commission's own investigator assigned to Plaintiff's case—was required to seek express permission from "Bar Counsel" before Plaintiff could be allowed to enroll in the class. This fact was documented in internal email correspondence and confirmed by Miller under oath. At the time, the role of Bar Counsel was held by Defendant Lawless. This further demonstrates that Defendant Lawless, in her capacity as Bar Counsel, maintained personal control over Plaintiff's purported compliance obligations. The resulting dynamic rendered the process fundamentally unfair, as Plaintiff was left unable to independently satisfy Program conditions that were deliberately structured to depend upon discretionary decisions controlled within the AGC hierarchy.

36. Additionally, Defendant Lawless barred Plaintiff from using attorneys at the 2225 Saint Paul Street incubator for advice and representation, unilaterally appointing Ivan Bates as counsel. While Mr. Bates is a respected African American attorney, he lacked the specialized experience dealing with the Maryland Bar and docketed matters.

37. Ultimately, Defendant Lawless targeted Plaintiff and arbitrarily removed him from the Divergent Program—further advancing a retaliatory effort to discredit and professionally disable Plaintiff.

38. Plaintiff's experience further mirrors a documented pattern of Defendant Lawless misusing her discretionary authority to initiate investigations outside of proper complaint procedures and in pursuit of improper political or retaliatory objectives. In *Attorney Grievance Comm'n v. Marylin Pierre*, Defendant Lawless opened an official investigation within one hour of receiving campaign literature from incumbent judges opposing Ms. Pierre's candidacy—without the filing of a formal complaint. The Court

ultimately rejected Bar Counsel's effort to disbar Ms. Pierre, imposing only a reprimand and expressing grave concerns about the appearance of impropriety. Justice Shirley Watts noted on the record that Lawless had received the campaign email not as a formal complaint, but as a member of the Montgomery County Bar Association, and questioned how the public could distinguish between Lawless acting in her official capacity versus acting to support the incumbent judges' campaign. Justice Watts further expressed concern about the Judiciary's resources being used to intervene in an election. Notably, the Court was forced to stay the Pierre case after Lawless refused to respond to discovery propounded by Pierre's counsel.[3] This pattern was replicated in Plaintiff's own case: following a spat with opposing counsel, Plaintiff was suddenly served with an investigation letter and removed from the Divergent Program. The timing and nature of this action strongly suggest that Lawless again exercised unchecked discretion to retaliate against Plaintiff, consistent with her demonstrated practices in prior matters such as Pierre.

39. At no point was Plaintiff afforded review by an impartial adjudicator or any neutral decision-maker with authority to reverse the revocation of his Diversion Program participation; instead, the same AGC officials who engineered the revocation controlled the entire process—rendering Plaintiff's removal and path to disbarment a foregone conclusion.

40. Under the Maryland Attorneys' Rules of Professional Conduct, the Attorney Grievance Commission's investigations are designated as confidential. Defendants have used this

---

[3] See Attorney Grievance Comm'n v. Marylin Pierre, https://attorneygrievances.com/recent-court-cases/reprimands/attorney-grievance-v-pierre; see also "Disciplinary Due Process," https://attorneygrievances.com/law-library/articles/disciplinary-due-process (detailing Court's concerns about impropriety and Bar Counsel's refusal to respond to discovery).

confidentiality structure to shield their actions from meaningful oversight and accountability. In Plaintiff's own disciplinary proceedings, this confidentiality enabled Defendant Lawless—who played an integral and driving role in the investigation, Diversion Program administration, and ultimate disbarment recommendation—to avoid being subject to deposition or cross-examination. Despite Defendant Lawless's central involvement in all material aspects of Plaintiff's matters, her position as lead Bar Counsel allowed her to operate without ever having to personally answer for her conduct under oath. This structural imbalance further deprived Plaintiff of a fair and impartial process, reinforcing the discriminatory and retaliatory nature of Defendants' actions.

41. Defendant Lawless personally oversaw Plaintiff's disciplinary prosecution, rejected proportionate outcomes, and insisted on disbarment—despite Plaintiff's full cooperation.

42. Without cause or adherence to proper procedure, Defendant Lawless recommended disbarment—a sanction grossly disproportionate to Plaintiff's conduct and inconsistent with outcomes for similarly situated white attorneys.

43. Defendants further engaged in improper conduct by communicating outside formal disciplinary channels, withholding exculpatory evidence, and using their positions to punish Plaintiff for protected speech and advocacy.

44. In contrast, grievances against white attorneys were routinely dismissed at the screening stage and never docketed.

45. The AGC does not maintain racial demographic records on attorneys investigated or sanctioned—despite a visible and troubling pattern of racially disparate outcomes.

46. Law firms with personal and professional ties to Bar Counsel staff—have been selected to receive referrals of client matters through the AGC's conservatorship process

following attorney disbarments or incapacitations. This process incentivizes the pursuit of disbarment or aggressive sanctions against certain attorneys, particularly Black attorneys, because once an attorney is disbarred, their active client matters and trust accounts must be transferred to conservators appointed by the AGC. Through this system, certain insiders—including firms linked to family members of Bar Counsel —have profited from these conservatorships. The AGC's failure to maintain transparent, impartial criteria for assigning conservatorships raises credible concerns of institutional self-dealing, financial conflicts of interest, and retaliatory targeting within the AGC's disciplinary practices.

47. Throughout Plaintiff's retaliatory investigation and disciplinary proceedings, Defendants McCully, Thompson, Risch, and others within the AGC knowingly participated in the enforcement of policies and practices they understood to be racially discriminatory and retaliatory. These Defendants engaged in coordinated actions—including the administration of the Diversion Program, the pursuit of sanctions inconsistent with comparable cases, the suppression of exculpatory evidence, and the communication of directives outside formal disciplinary channels—in furtherance of a common scheme to deprive Plaintiff of equal protection and due process. Their participation and agreement to further this conduct, and their active efforts to conceal the unlawful nature of these actions, constitute overt acts in support of a civil rights conspiracy.

48. Plaintiff requests that the Court take judicial notice of the Maryland Attorney Grievance Commission's publicly available Annual Reports from 2011 through 2024.[4]

---

[4] Pursuant to Federal Rule of Evidence 201, Plaintiff respectfully requests judicial notice of the Maryland Attorney Grievance Commission's Annual Reports from 2011 through 2024. The Reports are official publications of a state agency, maintained on the AGC's official website (https://www.courts.state.md.us/attygrievance/annualreport), and are not subject to reasonable dispute. The Reports are capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned. The statistical data contained therein, including annual sanction totals and geographic distribution of docketed cases, is referenced throughout this Complaint to demonstrate long-standing patterns and practices of selective enforcement relevant to Plaintiff's claims.

14

## CLAIMS FOR RELIEF

### Count I – Violation of Maryland Declaration of Rights: Articles 24 and 46

49. Plaintiff re-alleges all preceding paragraphs.

50. Article 24 of the Maryland Declaration of Rights guarantees that no person shall be deprived of life, liberty, or property without due process of law.

51. Defendants, acting under color of state law, violated Article 24 by subjecting Plaintiff to an unfair, biased disciplinary process lacking adequate procedural protections.

52. Article 46 prohibits discrimination based on sex, race, color, creed, or national origin.

53. Defendants' selective targeting of African American attorneys, including Plaintiff, based on race constitutes a violation of Article 46.

54. These violations of Maryland constitutional rights are actionable under state law and entitle Plaintiff to appropriate remedies. See *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67 (2001) (Article 24 is construed in pari materia with Fourteenth Amendment Due Process); *Burns v. State*, 312 Md. 406 (1988) (Article 46 prohibits race-based discrimination).

### Count II – Violation of the Fourteenth Amendment: Procedural Due Process (42 U.S.C. § 1983)

55. Plaintiff re-alleges all preceding paragraphs.

56. Defendants, acting under color of state law, deprived Plaintiff of his liberty and property interests in his professional license without providing adequate procedural safeguards.

57. Plaintiff was denied fair notice, an impartial adjudicator, access to exculpatory evidence, and an opportunity to meaningfully respond to the allegations.

58. Defendants further violated Plaintiff's procedural due process rights through the administration of the Diversion Program. The process for revoking Plaintiff's participation lacked impartial review: the same AGC officials who revoked Plaintiff's participation also controlled the decision on whether reinstatement would be permitted—rendering the process circular and fundamentally unfair. From the outset, the probationary structure imposed upon Plaintiff functioned as a de facto path to disbarment, rather than genuine rehabilitation, and deprived Plaintiff of a meaningful opportunity to retain his license.

59. These deprivations violate the Due Process Clause of the Fourteenth Amendment. *See Mathews v. Eldridge*, 424 U.S. 319 (1976); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

## Count III – Violation of the Fourteenth Amendment: Equal Protection (42 U.S.C. § 1983)

60. Plaintiff re-alleges all preceding paragraphs.

61. Defendants subjected Plaintiff and other African American solo attorneys to disparate treatment based on race, as evidenced by the selective initiation of investigations and imposition of harsher discipline, including in the administration of the Diversion Program and related disciplinary proceedings.

62. Defendants failed to subject similarly situated white attorneys—including those participating in the Diversion Program and those facing comparable allegations—to equivalent scrutiny, restrictions, or adverse consequences.

63. Defendants' discriminatory enforcement practices were concentrated in jurisdictions with large African American attorney populations, such as Baltimore City and Prince George's

County, and disproportionately targeted Black attorneys associated with Maryland's first community legal incubator space.

64. This intentional discrimination violates the Equal Protection Clause of the Fourteenth Amendment.

    *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

## Count IV – Violation of 42 U.S.C. § 1981 (Race Discrimination in Enforcement of Contracts)

65. Plaintiff re-alleges all preceding paragraphs.

66. Plaintiff's license to practice law and his ability to enter into, maintain, and perform contractual relationships with legal clients were impaired by Defendants' racially discriminatory conduct.

67. Defendants interfered with Plaintiff's ability to make and enforce contracts with clients on the same terms as white attorneys, including by forcing Plaintiff to withdraw from post-conviction representation, subjecting him to discriminatory disciplinary actions, and damaging his professional standing in the legal community.

68. This constitutes a violation of Plaintiff's rights under 42 U.S.C. § 1981. *See Patterson v. McLean Credit Union*, 491 U.S. 164 (1989).

## Count V – Violation of Title VI of the Civil Rights Act of 1964

69. Plaintiff re-alleges all preceding paragraphs.

70. Upon information and belief, the Attorney Grievance Commission of Maryland receives federal funding, in whole or in part, in connection with programs and activities that

support the administration of its disciplinary process.

As a recipient of federal funds, the AGC is required to comply with Title VI of the Civil Rights Act of 1964 and to administer its programs in a non-discriminatory manner.

71. Defendants administered the disciplinary process in a racially discriminatory manner that had a disparate impact on African American attorneys, including Plaintiff, in violation of Title VI. *See Alexander v. Sandoval*, 532 U.S. 275 (2001).

## Count VI — Conspiracy to Violate Civil Rights (42 U.S.C. § 1985)

72. Plaintiff re-alleges all preceding paragraphs.

73. Defendants Lawless, McCully, Thompson, Risch, and others within the Attorney Grievance Commission knowingly agreed and conspired to deprive Plaintiff of equal protection and due process through coordinated actions undertaken with racial animus and retaliatory intent.

74. In furtherance of this conspiracy, Defendants engaged in overt acts, including but not limited to:

(1) the administration of a Divergent Program structured to ensure Plaintiff's failure and disbarment;

(2) the pursuit of disciplinary sanctions grossly disproportionate to Plaintiff's conduct and inconsistent with comparable cases involving white attorneys;

(3) the suppression and withholding of exculpatory evidence;

(4) communications and directives issued outside formal disciplinary channels to further retaliatory objectives, including initiating investigations based on informal emails from politically connected individuals or opposing counsel, as occurred in Plaintiff's matter and in *Attorney Grievance Comm'n v. Marylin Pierre*, where Defendant Lawless opened

an official investigation within one hour of receiving politically motivated campaign materials without a formal complaint;

(5) the improper assignment of conservatorships to firms linked to family members of bar counsel staff as part of a pattern of institutional self-dealing designed to profit from the disbarment and incapacitation of targeted Black attorneys;

(6) engaging an outside Maryland law firm to conduct a superficial review of Plaintiff's complaint regarding discriminatory practices, while continuing to pursue coordinated retaliatory actions against Plaintiff;

(7) exploiting the confidentiality provisions of AGC proceedings to shield Defendant Lawless—who played a central role in the investigation and prosecution of Plaintiff—from deposition, cross-examination, or direct accountability, and maintaining personal control over Plaintiff's ability to comply with Program conditions, including requiring AGC investigator Charles Miller to seek permission from "Bar Counsel" (then held by Defendant Lawless) before Plaintiff could enroll in the required financial accounting course, thereby further impairing Plaintiff's ability to defend himself and reinforcing the discriminatory and retaliatory objectives of the conspiracy; and

(8) threatening Plaintiff with professional repercussions during an April 12, 2017 de bene esse deposition in the Smith matter to deter Plaintiff from pursuing protected cross-examination of the Complainant, and continuing to target Plaintiff thereafter in retaliation for his advocacy and opposition to discriminatory practices.

75. Defendants were further placed on explicit notice of the racially disparate impact of their conduct when, during a June 2, 2019 deposition, Plaintiff himself testified to the chilling

effect of AGC practices on Black attorneys—a fact acknowledged in the presence of Defendant Thompson, yet ignored as the retaliatory campaign continued.

76. Defendants acted with the shared purpose of silencing Plaintiff's protected advocacy, discrediting him professionally, and removing him from the legal profession because of his race and his opposition to the AGC's discriminatory practices.

77. Such coordinated actions constitute a conspiracy to violate Plaintiff's rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, in violation of 42 U.S.C. § 1985(3). *See Griffin v. Breckenridge*, 403 U.S. 88 (1971).

## Count VII – Retaliation in Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983)

78. Plaintiff re-alleges all preceding paragraphs.

79. Defendants, acting under color of state law, retaliated against Plaintiff for engaging in constitutionally protected activity, including the zealous representation of a Black attorney in proceedings adverse to Defendant Lawless and advocacy opposing discriminatory practices within the Attorney Grievance Commission.

80. In direct response to Plaintiff's protected activity, Defendants initiated a targeted disciplinary investigation of Plaintiff and imposed sanctions designed to punish Plaintiff for his advocacy and to chill future protected speech.

81. Defendants' retaliatory conduct lacked any legitimate governmental purpose and was motivated by animus toward Plaintiff's constitutionally protected conduct.

82. Such retaliation violates Plaintiff's rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

See *Perry v. Sindermann*, 408 U.S. 593 (1972); *Hartman v. Moore*, 547 U.S. 250 (2006); *Nieves v. Bartlett*, 587 U.S. ___ (2019).

Plaintiff has no adequate remedy at law to address the ongoing and irreparable harm caused by Defendants' conduct. Absent judicial intervention, Plaintiff will continue to suffer violations of his constitutional rights and professional standing. Accordingly, Plaintiff seeks the following relief:

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment against all Defendants;

B. Declare that Defendants violated Plaintiff's constitutional rights;

C. Award compensatory and punitive damages in an amount to be determined;

D. Award reasonable attorney's fees and costs under 42 U.S.C. § 1988;

E. Order injunctive relief, including recusal of Lawless and her office from Plaintiff's future proceedings;

F. Plaintiff further reserves the right to amend this Complaint under Federal Rule of Civil Procedure 15 to name additional Defendants as discovery reveals their full identities and roles in the conduct alleged herein.

G. Grant such other and further relief as the Court deems just and proper.

---

**JURY DEMAND**

Plaintiff demands a jury trial on all issues triable by jury.

21

Respectfully submitted,

Landon White
 Pro Se Plaintiff
2225 Saint Paul Street
Baltimore, MD 21218
4437990710